**Opinion issued August 23, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-11-00011-CV

—————————————

**HOUSTON AUTO M. IMPORTS NORTH, LTD., F/K/A HOUSTON AUTO IMPORTS NORTH, LTD., Appellant**

**V.**

**R&A HARRIS SOUTH, L.P., Appellee**

---

**On Appeal from the 113th Judicial District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-54586**

---

## MEMORANDUM OPINION

Appellant, Houston Auto M. Imports North, Ltd., formerly known as Houston Auto Imports North, Ltd. ("Houston Auto"), challenges the trial court's judgment, entered after a bench trial, in favor of appellee, R&A Harris South, L.P.

("R&A Harris"), awarding declaratory relief and damages for breach of contract and attorney's fees. In eight issues, Houston Auto contends that the evidence is legally and factually insufficient to support the trial court's award of damages, the trial court misconstrued the terms of the underlying contracts, the trial court's declaratory relief exceeds the scope of the Declaratory Judgments Act,[1] and the trial court erred in not granting Houston Auto judgment on the affirmative defenses of limitations and laches.

We affirm.

## Background

This suit arises out of a contract for the sale of real property from Houston Auto to R&A Harris. Houston Auto operated an automobile dealership on the property and, in February 2002, entered into a "Purchase and Sale Agreement" wherein R&A Harris agreed to pay $3.1 million for the property. Before closing, the parties, through their environmental consultants, investigated the property for environmental contamination. Houston Auto retained Applied Earth Sciences to assist in its investigation and possible remediation; R&A Harris retained CK Associates. During the investigation, the parties discovered that the property's soil and groundwater were contaminated with three chlorinated solvents generally used to clean automobiles.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–37.011 (Vernon 2008).

The parties traced the contamination to an underground storage tank, which the parties refer to as "UST-3," that had leaked contaminants before its removal several years prior to the sale. In its preliminary report on the contamination, CK Associates estimated that the "best-case scenario" for remediation would consist of five years of monitoring with a cost of approximately $180,000. In its "worst case scenario," CK Associates projected that if the contamination migrated off the property, remediation could take longer than ten years and cost up to $730,000. As a result of the contamination, the initial closing date was "significantly delayed" as the parties negotiated several amendments to the Purchase and Sale Agreement.

In June 2002, the parties signed a "Second Amendment to Agreement of Purchase and Sale," which delineated the responsibility of the parties with respect to remediating the contamination. Section 2 of the amendment provides,

> A. UST-3 Remedial Action. Seller, at its sole cost and expense, shall immediately commence and diligently pursue to completion in good faith all action necessary to remediate in accordance with all Applicable Laws (hereinafter defined) the soil and groundwater contamination associated with the release of chlorinated solvents found in the vicinity of the former underground storage tank known and referred to . . . as UST-3 . . . and shall remediate as necessary in the same manner all contamination which may arise from the potential offsite migration, if any, of the groundwater and soil contamination (the "UST-3 Remedial Action").
>
> Seller also shall diligently pursue and obtain a letter or certificate of completion from the TNRCC or other appropriate federal office or office of the State of Texas verifying satisfactory completion of the UST-3 Remedial Action within a

3

reasonable time after Closing. The UST-3 Remedial Action shall be complete upon receipt of such letter or certificate of completion from the TNRCC or other applicable office. Seller shall perform the UST-3 in compliance with all applicable laws, rules, and regulations of any governmental authority having jurisdiction over the remediation work (collectively, the "Applicable Laws").

  B. <u>Indemnity of Purchaser</u>. If Closing occurs, Seller agrees to indemnify, defend and hold harmless from and against any claims, demands, liability, loss, damages, fines, costs or expenses Purchaser may incur or which may be asserted against Purchaser as a result of or arising out of the foregoing soil and groundwater contamination, the activities of Seller associated with the UST-3 Remedial Action and/or the entry of Seller's agents, employees, or contractors upon the Property or adjacent properties associated with the UST-3 Remedial Action, including without limitation, reasonable attorneys' fees and related costs and expenses paid or incurred by Purchaser as a result of Seller's performance of the UST-3 Remedial Action. . . .

In August 2002, the parties signed a Mutual Environmental Indemnity Agreement.

Section 2(B) of that agreement provides in part,

From and after the Effective Date, Houston Auto Imports hereby agrees to indemnify, save, defend (at Houston Auto Imports' sole cost and expense) and hold harmless R&A . . . from and against the full amount of any and all Losses. "<u>Losses</u>" shall mean any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, costs, expenses and disbursements (including, but not limited to, attorneys' fees and all other professional or consultants' expenses incurred in investigating, preparing for, serving as a witness in or defending against any action or proceeding actually commenced against any Indemnified Person) which arise prior to, on or after the Effective Date and in addition any of the foregoing arising from or in connection with any of the following:

4

(a) the removal of any Hazardous Substance on or released from the Property prior to the Effective Date, whether such removal is done or completed by Houston Auto Imports, R&A, or any other person or entity and regardless of whether or not such removal is rendered pursuant to a court order or the order of an administrative agency . . . .

The sale closed on August 23, 2002, and, shortly thereafter, the parties applied to enter the site into the Texas Commission on Environmental Quality's ("TCEQ")[2] Voluntary Cleanup Program ("VCP"), which protects the applicants from an enforcement action by TCEQ or other regulatory agencies. Under the VCP, Houston Auto was required to outline the scope of the contamination in an Affected Property Assessment Report, which it submitted to TCEQ on May 31, 2003. On December 11, 2003, after some correspondence with TCEQ regarding the Assessment Report, Houston Auto submitted its Response Action Plan, which contained its proposals for remediating the site's contamination. In the Response Action Plan, Houston Auto proposed a process of "monitored natural attenuation," which would consist of quarterly tests of the groundwater from various monitoring wells installed throughout the site while the contaminants "naturally biodegrad[ed]." TCEQ accepted the proposal in February 2004.

In April 2004, Houston Auto then installed eleven monitoring wells around the site and performed its first tests of the groundwater. Three tests conducted in

---

[2] The Texas Natural Resource Conservation Commission changed its name to the Texas Commission on Environmental Quality on September 1, 2002. 30 Tex. Admin. Code § 3.2(8) (2002) (Tex. Comm'n Envtl. Quality, Definitions).

2004 revealed the groundwater was contaminated above the protected concentration levels permitted by TCEQ at Monitoring Well 1 ("MW-1"), located where UST-3 had been situated, and at Monitoring Well 3 ("MW-3"), which was located south and downstream from MW-1. Although the initial "plume" of contamination did not seem to extend past MW-3, in November 2004, Monitoring Well 7 ("MW-7"), which was located further southwest of MW-1 and situated near the property line, demonstrated contamination equal to the protected concentration level. In January 2005, Houston Auto conducted another test of the groundwater contamination levels, which again indicated contamination above the protected concentration levels at MW-1 and MW-3. The test also revealed contamination equal to the protected concentration levels at MW-7. However, Houston Auto missed the next three quarters of groundwater monitoring and did not analyze the monitoring wells again until March 2006.

At trial, Hollis Millard, a CK Associates environmental consultant, testified that the 2004 and 2005 testing results "seriously concerned" him because monitored natural attenuation was "no longer effective." He explained that the rise in contamination at MW-7 indicated a "strong potential" that the contamination was migrating south, possibly off-site to the adjoining property owned by the City of Houston. Based on these results, Millard, in early 2006, reported to Houston

6

Auto and its consultant, Delta Environmental Consultants,[3] that "groundwater quality beneath the site has not improved substantially since monitoring begun" and "the risk of offsite migration of affected groundwater is increasing." He suggested that "active remediation" was required.

After over one year of no testing, groundwater testing conducted in March 2006 revealed an "order of magnitude spike" of contamination above the protected concentration levels in MW-7. The testing also revealed that contamination at MW-1 and MW-3 remained above the protected concentration levels.

Larry Michel, a Giles Environmental Consultants environmental consultant,[4] testified that he was "sufficiently surprised" by the rise in contamination at MW-7. Because Houston Auto wanted to "make sure [it was] on steady footing," it had the groundwater samples tested again one month later. After confirming that MW-7 had experienced a significant rise in contamination, Michel felt that another source could be responsible for the increased contamination at MW-7. And he advocated more testing to "assess . . . potential secondary sources either adjacent to or on the site."

---

[3]     Applied Earth Sciences, the environmental consulting firm originally retained by Houston Auto, was purchased by Delta Environmental Consultants, Inc. during the events leading up to this suit.

[4]     Michel moved from Delta Environmental Consultants to Giles Engineering Consultants, Inc. in early 2006, but he remained on the Houston Auto site remediation project.

After submitting a plan to TCEQ, Houston Auto installed several more monitoring wells, including Monitoring Well 13 ("MW-13"), which was located southwest of MW-7 on City of Houston property, and Monitoring Well 12 ("MW-12"), which was located upstream from MW-7. In August 2006, data from the monitoring wells was analyzed, with MW-7 exhibiting the same high levels of contamination, but MW-13 showing minimal contamination. Houston Auto then prepared a Response Action Effectiveness Report in late 2006, summarizing the results of its groundwater analysis. Although TCEQ approved the Effectiveness Report in early 2007, Millard and CK Associates, in several letters to Houston Auto over the course of 2006, continued to warn that "[a]ctive remediation is required immediately" and there was a "need for immediate installation of a ground water recovery system" to prevent the contamination from spreading further.

In February 2007, Giles Environmental Consultants submitted a proposal to Houston Auto to more actively remediate the contamination through the injection of a Hydrogen Release Compound ("HRC") into the groundwater along the southern property boundary. In March, Houston Auto sent the plan to TCEQ for approval. While waiting for TCEQ approval, R&A Harris, through its attorney, Howard Greenberg, and Millard, expressed its concern that Houston Auto was "not proceeding with remediation, not complying with its obligations under the

8

Agreement of Sale, and . . . allowing migration to take place." In its response, Houston Auto cited Michel's analysis, noting that although he agreed that "contaminated groundwater will likely migrate beyond the southern Site boundary over time if left untreated," he assured the parties that TCEQ approval of the injection plan was forthcoming, Houston Auto had followed all the "requirements . . . administered by the TCEQ," and the project "appeared to be currently in good standing" with the TCEQ. The TCEQ approved the injection plan on July 2, 2007.

CK Associates also sent Houston Auto a memorandum, in which it asserted that "MW-13 does not adequately delineate" the southern migration of the contamination and recommended installation of additional wells. It explained that "[i]f [Houston Auto] and Giles do not agree with the necessity of this, R&A Harris . . . is prepared to have CK Associates install an additional monitoring well." Houston Auto replied that the Second Amendment to the Purchase and Sale Agreement did not require it "to place monitoring wells, or undertake any other activity at the site, whenever [R&A Harris] or its consultants believe it is appropriate." It further noted that TCEQ had "approved the delineation of [the] site . . . in accordance with applicable laws" and it was "satisfied with the TCEQ's conclusions that no further delineation is required." Houston Auto emphasized that the installation of additional monitoring wells would be installed at R&A Harris's "own expense and will not be reimbursable." In late 2007, at the direction

9

of R&A Harris, CK Associates installed two of its own monitoring wells, referred to as "CK MW-1" and "CK MW-2," along the southern boundary of the property.

After receiving a Well Injection Permit from TCEQ, the HRC injection was performed on August 27, 2007. Michel testified that he then waited until January 2008 to next test the groundwater because he needed "to give the material . . . injected into the ground a chance to work a little bit before . . . go[ing] back and spend[ing] more money to collect more samples to take a look at the effectiveness." The January testing results indicated that contamination had declined at MW-12 and remained stable at MW-1, MW-3, and MW-7. MW-13 continued to show only minimal contamination.

In late 2008, Houston Auto, based on an analysis by Giles Environmental Consultants, notified R&A Harris of an abandoned septic tank on the property that could potentially "represent[] a conduit for contaminants." Houston Auto suggested that the septic tank may have been the cause of the "sudden increase" of contaminants in MW-7 in March 2006, and it requested that R&A Harris "arrange for the immediate proper and lawful closure of the septic tank system." CK Associates, on behalf of R&A Harris, investigated the septic tank and concluded that "the potential for chemicals to have been released to the septic tank" after R&A Harris's purchase was "very low" because "no chemicals [had] been used or stored in the septic tank vicinity" after the purchase. However, CK Associates

10

agreed that "the septic tank should be properly removed because it is no longer in service" and removal was required "[t]o comply with county regulations." R&A Harris removed the septic tank in late 2009 and requested that Houston Auto provide reimbursement of $13,471.43 for the removal, noting that the septic tank "was never disclosed to the purchaser." However, Houston Auto maintained that there was no contractual "obligation by [Houston Auto] to reimburse [R&A Harris] for septic tank removal costs."

In August 2008, R&A Harris expressed its concern that "the HRC remedy, to be or remain effective, must be re-injected a year to a year and a half after the initial injections," and its consultants pressed Houston Auto to schedule another round of injections. The contamination remained relatively stable until April 2009, when MW-12 again revealed contamination above the protected concentration level. Houston Auto prepared another Response Action Effectiveness Report for TCEQ regarding the effectiveness of the HRC injections, and it indicated that it would submit another remediation plan by late 2009. However, in November 2009, CK Associates, on behalf of R&A Harris, submitted to TCEQ its own "Site Remediation Workplan," advocating the injection of an emulsified vegetable oil and cheese whey in several areas surrounding MW-1, MW-7, and MW-12. On January 20, 2010, the EI Group, on behalf of Houston Auto, submitted a separate "Remedial Work Plan," also advocating the injection of emulsified vegetable oil

11

and cheese whey, but TCEQ replied that it would not consider two competing remediation plans for the same site. R&A Harris then consented to the use of Houston Auto's remediation plan, which TCEQ approved in March 2010 and was scheduled to begin in September 2010. During this time, the latest groundwater monitoring results revealed contamination above the protected concentration levels at MW-1, MW-7, and MW-12, with MW-12 demonstrating the highest levels of contamination in any well. MW-13, the off-site monitoring well, never showed concentrations in excess of the regulatory limits. CK Associates' groundwater monitoring indicated contamination above the protected concentration level at CKMW-1, but no contamination at CKMW-2.

In its second amended petition, R&A Harris alleged that Houston Auto breached the Second Amendment to the Purchase and Sale Agreement by failing to "immediately commence and diligently pursue to completion all action necessary to remediate" the contamination and not "obtain[ing] regulatory approval or closure of the remediation within a reasonable time after closing of the purchase." R&A Harris sought damages of $85,920.36 in legal fees and $79,646.71 in environmental consulting fees, costs, and expenses "incurred as a result of the environmental contamination on the Property and Houston Auto's failure to diligently pursue remediation of the Property and complete such remediation within a reasonable time after closing." R&A Harris also sought a declaratory

12

judgment that Houston Auto be "required to indemnify [R&A Harris] for any such future costs, expenses and fees covered under the terms of the Second Amendment."

At trial, Millard opined that Houston Auto had not diligently pursued remediation of the property. He explained that "the strong potential for off-site migration ha[d] been known since 2004," but "nothing active was done until August of 2007," even though he had been advocating more active remediation "as early as 2006." Millard opined that "if an aggressive effort had been made to prevent the plume from spreading, we could have a conditional certificate of completion right now," and he criticized "gaps in the groundwater monitoring that have been irresponsible." Finally, Millard explained that the contamination "is worse off today than it was when we started," and he accused Houston Auto of "watch[ing] the plume slowly migrate to the fence line without doing much to stop it."

Michel testified that any delays in beginning the initial remediation plan were "ordinary" in dealings with TCEQ. Although Houston Auto did miss some groundwater monitoring events in 2005, TCEQ did not file "any sort of enforcement type of claim" as a result. Based on his analysis of TCEQ's database of properties entered into the VCP, Michel estimated that "15 years" was a reasonable time for remediation. He explained that chlorinated solvents, the

13

contaminants found on Houston Auto's property, were "some of the most difficult to clean up" and there was not "anything unusual" about such contaminants "still being under investigation and remediation after six or seven years in the [VCP]." Michel stated that R&A Harris's legal and environmental consultants had not assisted in his efforts to remediate the site "under TCEQ guidelines" and he had never received any notice of a violation or threat of enforcement action from TCEQ. Finally, Michel opined that he did not believe "the kind of fluctuations we're seeing" were "worthy of panic."

In its findings of fact and conclusions of law, the trial court found that R&A Harris had repeatedly expressed its dissatisfaction "with the results and pace of [Houston Auto's] remediation efforts" as a result of "sporadic groundwater monitoring activities," "untimely reporting," a "failure to consider and implement an active remediation program, continued migration of the contaminated groundwater plume toward the property boundary, a lack of decrease in the levels of chlorinated solvents, [and] suggestions . . . that [R&A Harris's] own activities on the property were a source of groundwater contamination." It also found that Houston Auto's "clean-up and remediation activity has been sporadic at best, at times . . . characterized by periods of inactivity, untimely regulatory reporting and little effort in the form of active remediation." The trial court further found that Houston Auto "has not exercised diligence by taking all action necessary" to

14

remediate the contamination and, "[h]ad [Houston Auto] taken 'all action necessary' to remediate and clean-up the property[,] it is reasonable to assume . . . that a certificate of completion could have and should have been obtained within four . . . years after the date of closing." Thus, the trial court concluded that Houston Auto's failure to obtain a certificate of completion within four years "constitutes a breach of its contractual obligations." It then found that R&A Harris was entitled to $116,975.44 on its breach-of-contract claim for the reasonable environmental consulting fees and legal fees incurred "in an effort to respond to . . . [the] lack of progress and results in cleaning up and remediating [the] property," under both the indemnity provision in the Second Amendment to the Purchase and Sale Agreement and the Mutual Environmental Indemnity Agreement. The trial court also declared that Houston Auto would be required to indemnify R&A Harris under the Second Amendment "for future costs and expenses which [R&A Harris] may incur as a result of [Houston Auto's] clean-up and remediation activities."

## Breach of Contract

In its first two issues, Houston Auto argues that the trial court improperly construed the Second Amendment to the Purchase and Sale Agreement because its construction imposes "greater responsibilities than were negotiated and agreed to." Houston Auto asserts that the contract only required it to pursue remediation "in

15

compliance with all applicable laws." Thus, in the absence of enforcement action from TCEQ, the trial court's finding that Houston Auto breached the contract by not obtaining a certificate of completion within four years imposed a stricter standard than that provided by the contract. Alternatively, Houston Auto asserts that, even if the trial court's "basic interpretation of the contract was correct," the evidence is legally and factually insufficient to sustain its conclusion that Houston Auto breached its contract with R&A Harris.

*Contract Construction*

A court should construe an unambiguous contract as a matter of law, and, on appeal, the court's ruling is subject to de novo review. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *MEMC Elec. Materials, Inc. v. Albemarle Corp.*, 241 S.W.3d 67, 70–71 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Usually, the intent of the parties can be discerned from the instrument itself. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.— Houston [1st Dist.] 2005, pet. denied). If a written contract is worded in such a

16

way that it can be given a definite or certain legal meaning, then the contract is not ambiguous. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). When the parties have entered into an unambiguous contract, the courts will enforce the intention of the parties as written in the instrument. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981).

When an issue regarding the construction of a contract is presented, we are required to take the wording of the instrument, consider the surrounding circumstances at the time of the contract's formation, and apply the rules of contract construction to ascertain its meaning. *ExxonMobil Corp.*, 174 S.W.3d at 312. The consideration of the facts and circumstances surrounding the execution of a contract is solely to aid our determination of the contract's meaning. *ExxonMobil Corp.*, 174 S.W.3d at 312. We must examine and consider the entire writing in an effort to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345.

Paragraph A of the Second Amendment to the Purchase and Sale Agreement provided,

> Seller, at its sole cost and expense, *shall immediately commence and diligently pursue to completion in good faith all action necessary to remediate in accordance with all Applicable Laws* (hereinafter defined) the soil and groundwater contamination associated with the release of chlorinated solvents found in the vicinity of the former underground storage tank known and referred to . . . as UST-3 . . . *and*

17

*shall remediate as necessary in the same manner* all contamination which may arise from the potential offsite migration, if any, of the groundwater and soil contamination (the "UST-3 Remedial Action").

Seller also *shall diligently pursue and obtain a letter or certificate of completion* from the TNRCC or other appropriate federal office or office of the State of Texas *verifying satisfactory completion of the UST-3 Remedial Action within a reasonable time after Closing*. The UST-3 Remedial Action shall be complete upon receipt of such letter or certificate of completion from the TNRCC or other applicable office. Seller shall perform the UST-3 in compliance with all applicable laws, rules, and regulations of any governmental authority having jurisdiction over the remediation work (collectively, the "Applicable Laws").

(Emphasis added.)

The plain language of the contract, as noted by the trial court, does not support Houston Auto's assertion that the use of the phrase "in accordance with all Applicable Laws" required adverse action by TCEQ to constitute a breach of Houston Auto's contractual obligations. Houston Auto's interpretation would render the more exacting language requiring it to "immediately commence and diligently pursue" remediation meaningless. *See Seagull Energy E & P, Inc.*, 207 S.W.3d at 345 (stating that courts should attempt to give meaning to each provision of contract). As noted by R&A Harris, the phrase "in accordance with all Applicable Laws" set the standard by which Houston Auto was to remediate the property, but the contractual obligation to "immediately commence" and "diligently pursue" remediation required more than that Houston Auto comply with applicable laws and TCEQ's requirements. Furthermore, Paragraph A

18

specifically imposed an obligation on Houston Auto to "diligently pursue and obtain a certificate of completion from the [TCEQ] . . . within a reasonable time after closing" without limiting that obligation to be "in accordance with all Applicable Laws."

### Sufficiency of the Evidence

Houston Auto next argues that the evidence is legally and factually insufficient to support the trial court's finding that it breached its contractual obligations because the parties "knew full well that a 'reasonable' worst case scenario [for remediation] was that the project could take ten years or more" to complete.

In an appeal of a judgment rendered after a nonjury trial, a trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence supporting them just as we would review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, no pet.). In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will sustain a legal sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete

19

absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id*. at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id*.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.

20

2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

In reviewing a factual-sufficiency challenge, we consider and weigh all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the trial court acts as fact-finder in a bench trial and is the sole judge of the credibility of witnesses. *See Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Here, the trial court found that Houston Auto breached its contractual obligations by failing to "exercise[] diligence in the clean-up and remediation of [the] property." The Texas Supreme Court has stated, "The term 'diligence' is relative and incapable of exact definition. Its meaning must be determined by the

21

circumstances of each case. Reasonable diligence has been defined as such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances. . . . It is usually a question of fact." *Strickland v. Lake*, 163 Tex. 445, 448, 357 S.W.2d 383, 384 (Tex. 1962); *see Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 637 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (stating that whether party has exercised "due diligence" is question of fact).

R&A Harris presented evidence that it and CK Associates expressed to Houston Auto their concern about the spread of the contamination and that they began to advocate for more active remediation to stop the spread as early as 2004. It is undisputed that, in 2005, Houston Auto missed three consecutive quarters of groundwater monitoring; at the next monitoring event, in March 2006, MW-7 demonstrated a significant rise in contamination at levels above the protected concentration levels mandated by TCEQ. Thus, the trial court could have reasonably concluded that it was not ordinarily prudent or diligent for Houston Auto to go over one year without conducting groundwater monitoring as required by TCEQ, especially when the chance for expansion of the contamination plume was known. On several occasions, Houston Auto was late in submitting its monitoring reports and action plans to TCEQ. And, in the eight years between the closing of the Purchase and Sale Agreement and the beginning of trial, the contamination had spread from a fairly localized area around MW-1 and MW-3 to

22

the southern boundary of the property, where both MW-7 and MW-12 exhibited contamination above the protected concentration levels. Finally, the most recent groundwater monitoring results indicated that MW-12 exhibited the highest levels of contamination yet to be recorded on site.

Viewing the evidence in the light most favorable to the verdict, the trial court could have reasonably found that Houston Auto's lapses in groundwater monitoring and reporting to TCEQ, in conjunction with its knowledge that the contamination had steadily gotten worse since the closing of the sale and appeared to be migrating towards the southern boundary of the property, constituted a breach of contract in that Houston Auto failed to "diligently pursue to completion in good faith all action necessary to remediate" the contamination and to "diligently pursue and obtain a letter or certificate of completion" from TCEQ. *See City of Keller*, 168 S.W.3d at 822. Furthermore, we conclude that the evidence supporting the trial court's finding is not so weak as to make the finding clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Houston Auto breached the Second Amendment to the Purchase and Sale Agreement.

We overrule Houston Auto's first and second issues.

**Statute of Limitations and Laches**

In its seventh and eighth issues, Houston Auto argues that the trial court should have granted it judgment on the affirmative defenses of statute of limitations and laches because R&A Harris believed Houston Auto had breached the agreement as early as 2003, but did not file its lawsuit until 2008.

A claim for breach of contract must be filed within four years after the day the cause of action accrues. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 2008); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). And the doctrine of laches provides an equitable remedy that prevents a plaintiff from asserting a claim due to a lapse of time. *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 912 (Tex. App.—Houston [1st Dist.] 1995, writ denied). In order to prevail on a claim of laches, a party must show (1) an unreasonable delay by the other party in asserting a legal or equitable right and (2) a good faith change in position to his detriment by the party asserting laches due to the delay. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989).

Houston Auto asserts that R&A Harris did not request reimbursement for attorney's fees until 2006 and consultants' fees until it filed suit in 2008. It further asserts, without elaboration, that the "delay in requesting reimbursement clearly prejudiced Houston Auto." However, Houston Auto does not discuss any "good

24

faith change in position to [its] detriment" as a result of the alleged delay. *See Rogers*, 772 S.W.2d at 80.

Houston Auto next argues that because R&A Harris's attorney John Hickey testified that he first thought that Houston Auto was in breach within six months of closing, the suit was filed "well outside the statute of limitations." However, "if the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed." *Davis Apparel v. Gale-Sobel, a Div. of Angelica Corp.*, 117 S.W.3d 15, 18 (Tex. App.—Eastland 2003, no pet.) (citing *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.)). The contract at issue here continued to impose an obligation on Houston Auto to diligently pursue remediation of the property and obtain a certificate of completion from TCEQ, so the limitations period has not accrued. *See id.*

Accordingly, we hold that the trial court did not err in not granting Houston Auto judgment on the affirmative defenses of statute of limitations and laches.

We overrule Houston Auto's seventh and eighth issues.

## Damages

In its third issue, Houston Auto argues that the trial court erred in awarding any damages to R&A Harris under the indemnity provision of the Second Amendment because it misconstrued the agreement to include costs "voluntarily"

25

and "unilaterally" incurred by R&A Harris, as opposed to costs "that arose from some action taken by Houston Auto or some claim made against [R&A Harris]." In its fourth issue, Houston Auto argues that the trial court erred in awarding damages under the Mutual Environmental Indemnity Agreement because R&A Harris did not plead a breach of that agreement and the agreement "can't be read logically to include all the costs the trial court awarded." In its fifth issue, Houston Auto argues that the trial court erred in awarding damages not shown to result from a breach of the contract and the damages were "excessive in many respects." Houston Auto generally contends that the "evidence is legally and factually insufficient to award the entire amount of fees" incurred by R&A Harris.

The indemnity provision of the Second Amendment provides,

If Closing occurs, Seller agrees to indemnify, defend and hold harmless from and against any claims, demands, liability, loss, damages, fines, costs or expenses Purchaser may incur or which may be asserted against Purchaser as a result of or arising out of the foregoing soil and groundwater contamination, the activities of Seller associated with the UST-3 Remedial Action and/or the entry of Seller's agents, employees, or contractors upon the Property or adjacent properties associated with the UST-3 Remedial Action, including without limitation, reasonable attorneys' fees and related costs and expenses paid or incurred by Purchaser as a result of Seller's performance of the UST-3 Remedial Action. . . .

The trial court found that the "clear language of the indemnity provisions of [the] Second Amendment to Agreement of Purchase and Sale provides a contractual basis under which [R&A Harris] may recover its environmental

26

consulting fees and expenses and outside counsel fees and expenses from [Houston Auto]." The trial court awarded R&A Harris $116,975.44 in "environmental consulting fees and expenses and outside counsel fees and expenses."

Indemnity agreements must be strictly construed, pursuant to the usual principles of contract interpretation, in order to give effect to the parties' intent as expressed in the agreement. *See Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 952–53 (Tex. 1983); *Crowder v. Scheirman*, 186 S.W.3d 116, 119 (Tex. App.— Houston [1st Dist.] 2005, no pet.). We must give terms in an indemnity agreement their plain, ordinary, and generally accepted meaning. *Lehmann v. Har–Con Corp.*, 76 S.W.3d 555, 562 (Tex. App.—Houston [14th Dist.] 2002, no pet.). An indemnity agreement is unambiguous if it can be given a definite or certain legal meaning, and we will construe an unambiguous indemnity agreement as a matter of law. *J.M. Davidson, Inc.*, 128 S.W.3d at 229.

Houston Auto argues that because the indemnity agreement states that it indemnified R&A Harris from any costs "as a result of or arising out of" the contamination, "the activities" of Houston Auto in remediating the contamination, or "the entry" of Houston Auto's agents onto the property, the agreement "necessarily implies that one party causes the other to incur costs." Because R&A Harris's actions in hiring environmental consultants to monitor the progress of the

remediation, installing new monitoring wells, and removing the septic tank were "voluntary," Houston Auto argues that these costs cannot be indemnified under the agreement as they were not "caused by" any action by Houston Auto.

However, the indemnity provision in the Second Amendment did not limit indemnity only to costs "as a result of or arising out of" some action by Houston Auto, but it included those costs incurred "as a result of or arising out of" the "foregoing soil and groundwater contamination" itself. The interpretation that every indemnified cost be precipitated by some action by Houston Auto is not supported by the plain language of the agreement.

The phrase "arising out of" "means that there is simply a 'causal connection or relation,'" or "but for causation," rather than direct or proximate causation. *Crimson Exploration, Inc. v. Intermarket Mgmt., LLC*, 341 S.W.3d 432, 443 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)). Here, the damages incurred by R&A Harris and awarded by the trial court have a sufficient causal connection to the "soil and groundwater contamination" and "the activities of [Houston Auto] associated with the UST-3 Remedial Action" as provided in the indemnity agreement. These damages include the environmental consulting fees incurred beginning in September 2004 for monitoring the progress of the remediation, communicating with Houston Auto and its environmental consultants, obtaining

28

second opinions on the monitoring results, and proposing new and more active methods of remediation. In addition, the damages include legal fees from outside counsel in communicating with Houston Auto, advocating that more active remediation was required under the terms of the Second Amendment, and preparing the complaint in the present suit. R&A Harris's counsel, Howard Greenberg, testified that the legal expenses incurred were "related" to Houston Auto's remediation of the property in an attempt to compel Houston Auto to comply with its contractual obligations in its remediation. We conclude that the trial court could have reasonably found that these costs arose out of the contamination of the property and Houston Auto's activities associated with the UST-3 Remedial Action. Therefore, the trial court did not err in awarding R&A damages under Section 2(b) of the Second Amendment to the Agreement of Purchase and Sale.

The trial court also awarded damages for R&A Harris's installation of two monitoring wells, CKMW-1 and CKMW-2, along the southern boundary of the property and the removal of a septic tank. Hollis Millard testified that the wells were installed after he had "expressed repeated concerns that there could be outside migration happening to the south." In regard to the septic tank, Houston Auto did not disclose the unused septic tank to R&A Harris before the closing of the sale, but first mentioned it in 2008 as a potential source of the spike in

29

contamination at MW-7. R&A Harris then removed the septic tank at its own expense in 2009. Tests made "in conjunction" with the removal indicated that the septic tank was not a source of the contaminants in MW-7, but at the time of its removal, its removal was considered part of the remediation of the property. We conclude that the trial court could have reasonably found that the costs of installing the additional monitoring wells and the removal of the septic tank also "arise out of" the contamination and Houston Auto's activities associated with the UST-3 Remedial Action, as provided in the indemnity provision of the Second Amendment.

Viewing the evidence in the light most favorable to the trial court's award, we conclude that the trial court could have reasonably concluded that Houston Auto was entitled to recover $116,975.44 in damages on its breach-of-contract claim. We further conclude that the evidence that supports the award is not so weak as to render the jury's award clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's award of damages to R&A Harris.

We overrule Houston Auto's third issue.[5]

---

[5] In its fourth and fifth issues, Houston Auto argues that the damages are also not recoverable under the Mutual Environmental Indemnity Agreement or as traditional breach of contract damages. Because we conclude that the indemnity provision of the Second Amendment provided an appropriate basis for the trial court's award of these damages, we need not address these arguments.

30

**Declaratory Judgment**

In its sixth issue, Houston Auto argues that the trial court erred in rendering a declaratory judgment under the Declaratory Judgments Act[6] because its declaration constitutes an "advisory opinion" that does "nothing to resolve any uncertainty between the parties."

A declaratory judgment is appropriate only if a justiciable controversy exists concerning the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). "To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Id.* If declaratory relief will not terminate a controversy between parties and would be irrelevant at the time judgment is rendered, a declaratory judgment will amount to no more than an advisory opinion, which the trial court lacks power to provide. *Kenneth Leventhal & Co. v. Reeves*, 978 S.W.2d 253, 259 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

The Declaratory Judgments Act specifically provides for a party to obtain a declaration on "any question of construction or validity arising under [an] instrument, statute, ordinance, contract, or franchise and obtain a declaration of

---

[6]     TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–37.011.

rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 2008). And a contract "may be construed either before or after there has been a breach." *Id.* § 37.004(b). Here, the trial court, in its declaration, merely construed the Second Amendment and declared that R&A Harris is entitled to its "fees, related costs, and expenses paid or incurred . . . in connection with [Houston Auto's] performance of its clean-up and remediation activities." It declared the rights of the parties under the Second Amendment as authorized by section 37.004. *See id.*; *BHP Petroleum Co. Inc. v. Millard*, 800 S.W.2d 838, 841–42 (Tex. 1990) (allowing defendant to pursue counterclaim for declaratory judgment in interpretation of gas purchase contract "which would have the effect of defining the obligations of the parties under that contract in the future"); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 702 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (affirming trial court's declaratory judgment stating that defendants were in compliance with deed restrictions because it involved "ongoing and continuous relationship" under deed). Accordingly, we hold that the trial court's declaratory judgment did not constitute an "advisory opinion" and was authorized by the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a), (b).

We overrule Houston Auto's sixth issue.

**Conclusion**

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.